UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SS&C TECHNOLOGIES, INC.,

Plaintiff,

v.

KRISTINA SPILLANE,

Defendant,

and

FIDELITY NATIONAL INFORMATION SERVICES, INC.,

Relief Defendant.

Civil Case No: **20-cv-00595 - AKH**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff SS&C Technologies, Inc. ("SS&C"), by its attorneys, Shearman & Sterling LLP, for its Complaint against Defendant Kristina Spillane ("Spillane") and Relief Defendant Fidelity National Information Services, Inc. ("FIS") hereby alleges as follows:

## NATURE OF THE ACTION

1. SS&C brings this lawsuit to redress the theft of some of its most valuable, confidential and competitive trade secrets. In late December 2019, Defendant Kristina Spillane left her position as a global client relationship manager at SS&C's subsidiary, DST Systems, Inc. ("DST"). Spillane left DST to join SS&C's competitor, Fidelity National Information Services, Inc. ("FIS"), where she began work on or about January 13, 2020. On December 16, 2019 – after being recruited by FIS, and just days before walking out the door at SS&C – Spillane emailed to her husband (who has no affiliation with SS&C) and requested he print four global relationship matrix reports ("Matrix Reports") documenting SS&C's global relationships with key customers representing hundreds of millions of annual revenue to SS&C.

2. The stolen Matrix Reports are among SS&C's most prized and closely guarded trade secrets. Each of the four reports comprises pages of detailed information laying out the services and products SS&C provides to the customer across SS&C's various business lines, opportunities for new business, perceived risks in the customer relationships, pricing strategy, marketing plans, and client coverage plans. The Matrix Reports collect, distill, and analyze SS&C's overall strategy for maintaining its existing business with these customers and for growing each relationship in the future. The Matrix Reports include specific detailed information on pricing, pricing strategy, the customer's needs and how to best address them, key customer contacts and many other topics central to the global customer relationship. This information is highly confidential, is designated as such in the Matrix Reports, and is only shared on a "need to know basis" within SS&C.

3. Defendant Spillane had no valid business reason to transmit the Matrix Reports outside of SS&C (to her husband) in December 2019. On December 16, 2019 when she transmitted the reports, Spillane had been in the recruitment process with FIS for some time and she left her employment at SS&C just eight days later. Moreover, contrary to SS&C policy, Spillane did not return the hard copy Matrix Reports that she caused to be printed out when she left SS&C. Instead, to SS&C's knowledge, she has retained them (in hard copy and electronic form) as an employee of FIS.

4. FIS is a direct and substantial competitor of SS&C in numerous business lines. With Spillane's deep knowledge and experience with SS&C's business – and armed with the four Matrix Reports packed with data and strategy about SS&C's key customer relationships – FIS is now in a position to use SS&C's proprietary information and strategies to engage in devastating, unfair – and illegal – competition against SS&C. Indeed, FIS has made clear its

desire to compete aggressively with SS&C and to poach SS&C's employees in order to do so: In the fall of 2019, FIS hired a DST sales executive in its transfer agency business (Stephen Grande) and DST's former compliance head for its Asset Management Solutions Group's transfer agency business, a client-facing role advising customers on compliance-related issues in the transfer agency space (Craig Hollis). Shortly after being hired at FIS, Hollis told an SS&C executive that FIS was aggressively building its product lines that compete with SS&C, that FIS could take business away from SS&C, and that SS&C should expect FIS to hire away more of its employees very soon. Just two months later (in December 2019), FIS poached Spillane, and just last week, FIS hired away another DST employee (Kimberly O'Connor) who held a leadership role in the same SS&C business line as Grande, Hollis, and Spillane.

5. Accordingly, SS&C brings this action under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 for misappropriating SS&C's confidential trade secrets. SS&C seeks damages, an injunction prohibiting Defendant Spillane and her new employer, Relief Defendant FIS, from retaining, using, disseminating or disclosing the proprietary and confidential information Spillane stole, and other relief as described herein.

## PARTIES, JURISDICTION, AND VENUE

6. Plaintiff SS&C is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 80 Lamberton Road, Windsor, Connecticut. SS&C is a global business with offices around the world, including an office in New York, New York. SS&C is in the worldwide business of providing specialized software for the global financial services industry. SS&C has several subsidiaries and affiliates, including DST, a subsidiary that SS&C acquired on April 16, 2018. DST is a leading provider of specialized technology, strategic advisory, and business operations outsourcing to the financial and healthcare industries.

7. Defendant Spillane is a former employee of DST who resides in Massachusetts. Most recently, Spillane was a Global Relationship Executive in DST's Asset Management Solutions Group, with responsibility for managing several of DST's and SS&C's most important global customer relationships. Spillane left DST on December 24, 2019 to join FIS in a similar role, as a Strategic Accounts Manager. Spillane started working at FIS on or about January 13, 2020.

8. Relief Defendant FIS, Spillane's current employer, is a corporation organized and existing under the laws of the State of Georgia with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida. FIS is a provider of technology, solutions and services for merchants, banks and capital markets businesses across the globe, and therefore competes with both SS&C and DST across a variety of products and services domestically and internationally.

9. This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 18 U.S.C. § 1836(c).

10. This Court has personal jurisdiction over Defendant Spillane and Relief Defendant FIS pursuant to N.Y. C.P.L.R. § 302(a). Among other things, (i) SS&C manages several of its key global relationships, including those that are the subject of the misappropriated Matrix Reports, largely out of its New York office; (ii) several of SS&C's global relationship customers, including some that are the subject of the Matrix Reports, are based in New York; (iii) Spillane, while working at DST, personally visited New York-based global relationship customers in New York, including making visits to JPMorgan Chase & Co. ("JPMorgan") and another client in the fourth quarter of 2019; (iv) FIS also has an office in New York and manages

its global relationships, at least in part, from that office; and (v) Spillane is, on information and belief, reporting directly or indirectly to FIS' Chief Revenue Officer, who is based in New York.

11. Venue is proper in this District because the events giving rise to the claims occurred here, U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

### A. The Businesses of SS&C, DST and FIS

12. SS&C is a pioneer and market leader in delivering software and software-enabled services to asset managers, insurance companies and other financial institutions to automate their complex business processes. Founded in 1986 by Bill Stone, SS&C has thousands of customers including banks and commercial lenders, mutual funds, hedge funds, private equity firms, real estate investment trusts, corporate treasury groups, insurance companies, pension funds, municipal finance groups and real estate property managers. SS&C built its business through decades of hard work, ingenuity, technological innovation and investments of hundreds of millions of dollars to develop its valuable trade secrets and know-how.

13. SS&C acquired DST in April 2018 in a transaction valued at about $5.4 billion. DST is an industry leader in providing customers with transfer agency and asset management services, including back office record-keeping.

14. FIS is also an important player in the financial technology sector. FIS provides an array of financial technology services to financial institutions, including services used by asset managers, mutual funds, traders, custodians, treasurers, third-party administrators and clearing agents. FIS competes for many of the same customers as SS&C, especially in the areas of transfer agency, investment management and accounting, and business process

outsourcing. It is common for SS&C and FIS to compete for the same customers at the same time as part of RFPs and similar processes. For example, FIS offers to its customers and markets to its prospects a retirement account servicing platform called OMNI, which competes directly with SS&C's retirement account servicing platform, TRAC. Similarly, FIS' SunGard investment accounting services and software compete with several SS&C business lines including Advent and GlobeOp.

15. SS&C has "global relationships" with certain of its most important clients, which means SS&C provides these clients with a host of products and services, in the United States and internationally, across the financial technology landscape and via separate SS&C business lines. SS&C's global relationships are among its most valuable assets as they represent a significant share of SS&C's revenues and are among SS&C's most important opportunities for developing future business.

16. SS&C's global relationships include four that are the subject of the Matrix Reports stolen by Defendant Spillane: JPMorgan, Janus Henderson Investors ("Janus"), Columbia Threadneedle Investments ("CTI") and Invesco Ltd. ("Invesco"). These relationships represent hundreds of millions of dollars of revenue to SS&C. FIS has historically pursued opportunities to sell products and services that compete directly with the products and services that SS&C provides to these four customers. Indeed, FIS has provided – or sought to provide – its services to at least JPMorgan and CTI during the past twelve months.

**B. Spillane's Position at DST and Her Recruitment by FIS**

17. Spillane joined DST in 2001 and held a variety of client relationship positions. Most recently, Spillane was a Global Relationship Executive in DST's Asset Management Solutions Group. In that position, Spillane's responsibilities included managing,

developing and growing some of DST and SS&C's most important global relationship clients. Among others, Spillane had responsibility for global SS&C clients JPMorgan, Janus, CTI and Invesco.

18. Over the last year, FIS has actively targeted and recruited SS&C employees to assist its business and to further its goal of stealing SS&C market share. In or about November 2018, Stephen Grande, a successful DST sales executive with responsibility for DST's sales in the transfer agency business, resigned from DST. Grande joined FIS at least in or about the fall of 2019 in a sales-related function.

19. In or about June 2019, Craig Hollis, the then head of compliance for DST's Asset Management Solutions Group's transfer agency business, left DST. As the head of compliance, Hollis had significant, client-facing roles by, among other things, advising DST's clients regarding the myriad of regulatory obligations related to the transfer agency business. An industry leader in the regulatory transfer agency business, Hollis joined FIS in or about October 2019. Notably, after joining FIS, Hollis told an SS&C executive at a trade conference that FIS was investing aggressively in its transfer agency business and that FIS believed it could take business from SS&C. Hollis further told the SS&C executive, alluding to FIS' active recruitment campaign, that SS&C should "expect more" of its personnel to resign and move to FIS.

20. In or about September 2019, Spillane applied for a more senior position at DST. After being denied the promotion, Spillane determined to leave DST. Spillane began looking for opportunities outside SS&C at least as early as fall of 2019. After recruiting Spillane for some time, FIS transmitted an official, written offer of employment to Spillane on December

17, 2019. Spillane announced her resignation on December 23, 2019, and DST terminated her system and building access on December 24, 2019, which effectively served as her last day.

21. Spillane began working at FIS on or about January 13, 2020 as a Strategic Accounts Manager, a position nearly identical to her position at DST, *i.e.* she will have responsibility for managing FIS' most important strategic accounts. Moreover, Spillane's position at FIS will be at least as senior as her position at DST; indeed, Spillane informed SS&C upon leaving DST that she expected her new position would involve a "leadership role" at FIS.

22. Continuing the trend of FIS poaching SS&C employees, even just last week, Kimberly O'Connor, a Vice President for the transfer agency business at ALPS Fund Services (a DST subsidiary) gave notice that she would be leaving ALPS for FIS. ALPS also provides services in the transfer agency business that FIS is looking to compete for aggressively against SS&C.

**C. Spillane's Theft of SS&C Trade Secrets**

23. By December 2019, although Spillane remained a DST employee, Spillane had been involved in talks to move to FIS for some time. As stated above, Spillane received a written offer of employment from FIS on December 17, 2019 and her last day at DST was December 24, 2019.

24. On December 16, 2019 at 1:48 p.m., Spillane sent an email to her husband (a lawyer with no affiliation to DST or SS&C) attaching the four Matrix Reports for clients JPMorgan, Janus, CTI, and Invesco. In the email, Spillane instructed her husband to print the documents in hard copy.

25. The Matrix Reports contain highly valuable, confidential business information of DST, SS&C and other affiliates, including details regarding their global

relationships with JPMorgan, Janus, CTI, and Invesco. All four of these clients are global asset managers. DST, SS&C and other affiliates provide various financial technology services to these four clients via a number of service and product offerings throughout the United States and globally, and are actively seeking to pursue additional opportunities and solutions for these clients. All told, these highly valued, global relationships generate hundreds of millions of dollars of revenue for SS&C.

26. Each Matrix Report is designated "confidential" and includes highly confidential information concerning: the particular services that SS&C currently offers to these four clients and pricing-related information (including SS&C's revenues associated with particular services, and certain term and renewal information for specific contractual arrangements); significant business opportunities and solutions that SS&C is pursuing with each of these clients, along with pricing-related information for those opportunities; "action" plans relating to executing particular opportunities with these clients; "risks" associated with these client relationships, including certain perceived concerns or vulnerabilities; and key contacts at each respective client pertaining to the relationship.

27. The information contained in the Matrix Reports is highly valuable to SS&C, which relies on the reports to manage and grow its most important customer relationships, and is shared within SS&C on a "need to know" basis. The Matrix Reports would also be of immense value to SS&C's competitors, such as FIS, for several reasons, which include the following:

28. *First,* if a competitor learns pricing-related information for the products or services that SS&C offers, then it may use that information to gain an unfair competitive advantage against SS&C. A competitor could, for example, use this information to undercut

SS&C's pricing for a particular product or service offering in an attempt to take over that client relationship, or to attempt to impact the pricing that SS&C charges its customers.

29. *Second,* the "opportunities" listed in the Matrix Reports are the product of considerable time and effort that SS&C employees have devoted to identifying business opportunities and prospects, identifying the related needs of their clients and customers, presenting these opportunities to them, and negotiating potential transactions. Many of the opportunities referenced in the Matrix Reports include ones that are currently being pursued. Indeed, all of these Matrix Reports are dated September 2019. These opportunities are also highly confidential, and include information relating to price and certain key terms (such as renewal time-frames). If a competitor learned this information, it would permit the competitor to take a "short cut" around the time and effort that went into pursuing each particular opportunity to target the same opportunities that SS&C is pursuing, and to use SS&C's analysis and approach towards these opportunities (including about price) to its advantage. Renewal information is particularly sensitive because SS&C often competes with FIS for long-term contracts, the renewal dates for which are confidential and non-public.

30. *Third*, the "risks" listed in the Matrix Reports provide details about the overall client relationships, including areas for improvement based in part on client feedback. If a competitor could access this information, it could capitalize on SS&C's internal assessment of its performance, including areas in which SS&C is seeking to improve. This would allow a competitor to use this information to its competitive advantage, including by seeking to instill "fear, uncertainty, and doubt" in the client.

31. *Fourth,* the Matrix Reports include information regarding key contacts at the respective SS&C clients, including for the main decision-makers associated with the services

that SS&C provides to each client. This client contact information is the product of significant efforts that SS&C Sales and Product teams have spent cultivating the client relationships. If a competitor obtained this information, then the competitor could short cut the time it took to cultivate these relationships and contacts, and have a direct line to the client personnel with whom SS&C communicates about its products.

32. There was no valid business reason for Spillane to have sent the Matrix Reports via email to a third-party (her husband) in contravention of SS&C's information securities policies, or to have arranged for hard copies of these documents to be printed outside of the office on December 16, 2019 (approximately a week before Spillane's last day at SS&C). Spillane could have accessed these documents in electronic form from her SS&C laptop while working in the office or remotely. Therefore, there was no reason for her to instruct a third party to print them in hard copy. Notably, Spillane did not return the hard copy documents to DST or to SS&C after leaving her employment, as required by DST policies. To SS&C's knowledge, Spillane has retained the four Matrix Reports to this day even though she is now working at FIS.

33. With Spillane's deep knowledge and experience of SS&C's business – and armed with the four Matrix Reports packed with data and strategy about SS&C's key customer relationships – FIS is now in a position to use SS&C's proprietary information and strategies to engage in devastating, unfair – and illegal – competition against SS&C.

34. On January 13, 2020, SS&C notified Spillane and FIS in writing that SS&C had learned about Spillane's theft of the Matrix Reports. SS&C requested that FIS cease and desist any use or distribution of the Matrix Reports and, further, that FIS undertake an investigation to determine, among other things, whether and the extent to which the Matrix Reports had been further disseminated within FIS. SS&C requested that FIS provide a

substantive response by January 16, 2020. To date, FIS has not advised SS&C whether Spillane and/or FIS continue to possess the Matrix Reports, whether they were further disseminated, or how FIS may have used the reports in competing with SS&C.

**FIRST CLAIM FOR RELIEF**

(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)

35. SS&C repeats and realleges each allegations set forth in paragraphs 1 through 34 as if fully set forth herein.

36. SS&C is the rightful legal owner of the proprietary and confidential information that was contained in the Matrix Reports.

37. The SS&C products and services described in the Matrix Reports are used in and intended for use in, interstate and foreign commerce.

38. The Matrix Reports that Spillane improperly emailed to her husband on December 16, 2019 contained, without limitation, SS&C's financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, including highly sensitive customer and marketing information.

39. SS&C took reasonable measures to keep the above information secret and confidential, including by designating the documents "Confidential" and instructing employees that SS&C's intellectual property belonged to SS&C and could not be used for non-SS&C business purposes.

40. The contents of the Matrix Reports that Spillane improperly emailed to her husband included information highly valuable to SS&C, which was not known to, and not readily ascertainable through proper means by, competitors such as FIS.

41. A competitor such as FIS would derive substantial value from the information contained in the Matrix Reports. Among other things, Spillane and FIS could use the Matrix Reports to understand the commercial strategy of a key competitor, to identify new customer opportunities, to learn confidential information about those customer opportunities (including price-related information), and to undermine SS&C's efforts to maintain and grow its business with these customers.

42. Spillane was not authorized to email the Matrix Reports outside of SS&C on December 16, 2019, nor was she authorized to make hard copies that she would keep with her after leaving employment at SS&C.

43. As a result of her continued possession of the Matrix Reports while working for FIS, Spillane has also disclosed or used SS&C's proprietary and confidential information she acquired using improper means as described herein.

44. Spillane's wrongful conduct in misappropriating SS&C's proprietary and confidential information through improper means has damaged SS&C.

**SECOND CLAIM FOR RELIEF**

(Preliminary and Permanent Injunction, 18 U.S.C. § 1836(b)(3)(A))

45. SS&C repeats and realleges each allegation set forth in paragraphs 1 through 44 as if fully set forth herein.

46. Dissemination of the proprietary and confidential information described herein would result in immediate and irreparable harm to SS&C.

47. SS&C is entitled to a preliminary and permanent injunction enjoining and restraining Spillane and Relief Defendant FIS from misappropriating, converting, possessing, retaining, sharing, using or in any way disseminating SS&C's confidential information.

**DEMAND FOR JURY TRIAL**

48. Under Federal Rule of Civil Procedure 38, Plaintiff SS&C respectfully requests a trial by jury on all claims so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SS&C respectfully requests the following relief:

(a) Judgment against defendant Spillane adjudging her to be liable to SS&C for misappropriation of trade secrets under DTSA, 18 U.S.C. § 1836;

(b) An award of actual damages, damages for unjust enrichment, damages measured as a reasonable royalty, and punitive damages against Spillane as authorized by 18 U.S.C. § 1836(b)(3)(B) & (C);

(c) The issuance of a preliminary and permanent injunction enjoining and restraining Defendant Spillane and Relief Defendant FIS from misappropriating, converting, possessing, retaining, sharing, using or in any way disseminating SS&C's confidential information as authorized by 18 U.S.C. § 1836(b)(3)(A);

(d) Judgment awarding Plaintiff SS&C its costs and disbursements in this action, including reasonable attorneys' fees (*see* 18 U.S.C. § 1836(b)(3)(D)); and,

(e) Such other and further relief as this Court deems just and proper.

Dated: New York, New York
January 22, 2020

SHEARMAN & STERLING LLP

By: ______________________
Stephen Fishbein
Christopher LaVigne
Michael Holt

599 Lexington Avenue
New York, New York 10022
(212) 848-4000
sfishbein@shearman.com
christopher.lavigne@shearman.com
michael.holt@shearman.com

*Attorneys for SS&C Technologies, Inc.*